IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-03267-TMT-NRN

ESTATE OF LORENZO GABRIEL FLORES, by and through its personal
representative,
CARRIE AGBISIT; and
T.G. , a minor child, by and through TASHA GARCIA,

Plaintiffs,

v.

SUPPLEMENTAL HEALTH CARE, INC.;
CELIA RIFE, individually; and
ANITA NORMANDY, individually

Defendants.

---

**REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT FROM DEFENDANTS' SUPPLEMENTAL
HEALTH CARE, CELIA RIFE AND ANITA NORMANDY (Dkt. #182)
and
ORDER ON PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ASSERT
EXEMPLARY DAMAGES REMEDY UNDER STATE LAW AGAINST DEFENDANTS
NORMANDY AND RIFE (Dkt. #185)**

---

**N. Reid Neureiter
United States Magistrate Judge**

This matter is before the Court pursuant to Orders (Dkt. ##183 & 185) issued by

Circuit Judge Timothy M. Tymkovich referring two motions:

- Defendants SHC Services, Inc. dba Supplemental Health Care (sued as

  Supplemental Health Care, Inc.) ("SHC"), Celia Rife, and Anita Normandy's

  (collectively, "SHC Defendants") Motion for Summary Judgment. (Dkt. # 183.)

  Plaintiffs the Estate of Lorenzo Gabriel Flores and T.G., a minor child

(collectively, "Plaintiffs"), filed a response (Dkt. #191), and the SHC Defendants filed a reply. (Dkt. #197.)

- Plaintiffs' Motion to Amend Complaint to Assert Exemplary Damages Remedy Under State Law Against Defendants Normandy and Rife ("Motion to Amend") (Dkt. #185), to which the SHC Defendants responded (Dkt. #193) and Plaintiffs replied. (Dkt. #201.)

The Court heard oral argument on April 13, 2023. (*See* Dkt. #202.)

Now, being fully informed and for the reasons discussed below, it is hereby **RECOMMENDED** that the SHC Defendants' Motion for Summary Judgment (Dkt. #182) be **DENIED**, and **ORDERED** that Plaintiffs' Motion to Amend (Dkt. #185) be **GRANTED**.

## MOTION FOR SUMMARY JUDGMENT

### BACKGROUND[1]

This 42 U.S.C. § 1983 lawsuit was filed after Lorenzo Gabriel Flores died in the Colorado Territorial Correctional Facility ("CTCF") of pulmonary thromboembolism on August 3, 2017. The only remaining claims are for deliberate indifference and medical negligence against Defendant Normandy, and for medical negligence against Defendants Rife and SHC.

In a December 18, 2020 Order (Dkt. #104) ruling on various motions to dismiss, Judge Tymkovich summarized the surviving claims against the SHC Defendants as follows:

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

**Defendant Nurse Anita Normandy**: "Plaintiffs allege that on August 3, 2017, Normandy found Flores on the floor of his cell having a seizure. She placed Flores on his bed and left. While Normandy was away, Flores went into cardiac arrest and was pronounced dead 31 minutes after Normandy found him on the floor." (Dkt. #104 at 22–23.) Judge Tymkovich determined that Plaintiffs plausibly alleged a deliberate indifference claim because a seizure is a type of medical event that is sufficiently serious that even a lay person would recognize the necessity for a doctor's attention, and that by leaving the cell and taking no further action, Normandy disregarded an excessive risk for Mr. Flores's health or safety. (*Id.* at 23–24.)

**Defendant Nurse Practitioner Celia Rife**:

Plaintiffs allege Rife saw Flores on consecutive days shortly before his death, and observed signs of dehydration, which Plaintiffs say was a "clear and obvious" sign that Flores was at risk of deep vein thrombosis. Accepting as true the Plaintiffs' allegation that "[d]ehydration is one of the causes of pulmonary thromboembolism," this court finds it plausible that Rife had a duty of care to take steps to ensure Flores was hydrated; that she breached that duty; and that Rife's breach was a proximate cause of Flores's pulmonary thromboembolism.

(*Id.* at 30 (internal citations to docket omitted).) Thus, Plaintiffs' negligence claim against Defendant Rife survived dismissal, but Judge Tymkovich dismissed the deliberate indifference claim as to Defendant Rife. (*Id.* at 24–25.)

Finally, Judge Tymkovich permitted Plaintiffs' medical negligence claim to proceed against **SHC** on the theory of vicarious liability. (*Id.* at 31.)

The SHC Defendants now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. They argue that there is no evidence that Defendant Normandy possessed the subjective intent necessary for a cognizable Eighth Amendment deliberate indifference claim. They further argue that Defendants

Normandy and Rife acted reasonably under the circumstances and that Plaintiffs have failed to demonstrate that their actions (or inaction) were the proximate cause of Mr. Flores's death, and that if Normandy and Rife were not negligent, Plaintiffs cannot maintain a claim for vicarious liability against SHC.

## LEGAL STANDARD

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

The moving party bears the initial responsibility of providing the court with the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary

judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

   If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *see also Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52 (1986).

## ANALYSIS

### Undisputed Material Facts[2]

Mr. Flores began a five-year prison sentence in February 2016. (Dkt. #182 at 3 ¶ 1; Dkt. #191 at 1 ¶¶ 1–3.) He was transferred to Fremont Correctional Facility ("FCF") on July 19, 2017. (Dkt. #182 at 3 ¶ 3; Dkt. #191 at 1 ¶¶ 1–3.) Mr. Flores's intake records note that he "ambulated without difficulty. No physical deformities noted. No urgent medical or mental health concerns reported at time of arrival." (Dkt. ##182 at 3 ¶ 5, 182-1 at 1.)[3] However, the records also note Mr. Flores's medical conditions, including unspecified diseases of the blood and blood-forming organs and abnormal blood test, document Mr. Flores's psychiatric level as "3N other psychiatric diagnosis w/high MH needs," and describe his Axis I diagnosis as "psychotic disorder nos." (Dkt. ##191 at 1 ¶ 4, 191-1.)

On July 20, 2017, Mr. Flores was seen by Nurse Jeri McSherley at the FCF medical clinic on an emergency walk-in suggested by mental health, who wanted Mr. Flores seen because "he was doubled over with leg pain." (Dkt. ##182 at 3–4 ¶ 5, 182-1 at 3; Dkt. #191 at 2 ¶ 5.) Records indicate that Mr. Flores told Nurse McSherly that "he was having zero pain when he arrived at the medical clinic," but he did report that in the past two weeks he had had some leg pain. (Dkt. ##182 at 4 ¶ 6, 182-1 at 3; Dkt. #191 at

---

[2] Unless otherwise specified, the following facts are undisputed.
[3] The Court notes that Plaintiffs generally object that "all medical records cited by Defendants purporting to demonstrate that Flores was not suffering any serious medical concerns could be rejected by a reasonable jury as incomplete and/or false." (Dkt. #191 at 1 ¶ 4.)

2 ¶¶ 6–8.) Nurse McSherley conducted a physical examination and sent Mr. Flores back to his cell and told him to let the "clinic know if he started to have pain and to drink lots of water." (Dkt. ##182 at 4 ¶¶ 7–8, 182-1 at 3; Dkt. #191 at 2 ¶¶ 6–8.)

On July 23, 2017, Nurse Mariah Moore initiated FCF's hunger strike protocol upon reports by corrections officers that Mr. Flores had missed four meals had not eaten or drank anything and since July 22, 2017. (Dkt. ##182 at 4 ¶ 9, 182-1 at 6; Dkt. #191 at 2 ¶ 9.) Nurse Moore noted in Mr. Flores's medical records, "Offender does not appear dehydrated. Visible mucous membranes appear moist, intact, and pink". (Dkt. ##182 at 4 ¶ 10, 182-1 at 6; Dkt. #191 at 2 ¶ 10.)

When Mr. Flores was transferred to CTCF on July 27, 2017, a welfare check was performed and nursing staff reported that Mr. Flores had not come to the door for anything since his arrival, had not eaten dinner, and refused to leave his cell for assessment, stating "I just don't feel like getting up right now." (Dkt. ##182 at 4 ¶ 11, 182-1 at 8; Dkt. #191 at 2 ¶ 11.) Nurse Danielle Jernigan went to Mr. Flores's cell and observed Mr. Flores on his bed: "Patient 33 yo male who was laying down in bed and making purposeful independent position changes. He appeared alert. He was calm and cooperative. He responded to verbal stimuli. Patient did not answer all questions posed to him, but when he answered, his answers were appropriate"; "No obvious signs of confusion noted"; "Patient's hygiene was appropriate. Hair styled. No odor noted"; "No obvious signs of injury, deformity, or distress noted." (Dkt. ##182 at 5 ¶ 12, 182-1 at 8; Dkt. #191 at 2 ¶ 12.)

Mr. Flores was admitted to the infirmary at CTCF on July 28, 2017. (Dkt. ##182 at 5 ¶ 13, 182-1 at 10; Dkt. #191 at 2 ¶ 13.) Nurse Jernigan's notes indicate that Mr.

Flores's "hygiene was appropriate. No body odor noted. No evidence of incontinence. No obvious signs of confusion noted – patient used his own bed and property. And used them with no apparent difficulty. He followed directives by Security." (Dkt. ##182 at 5 ¶ 14, 182-1 at 13.) But other evidence suggests that Mr. Flores had strong body odor and halitosis. (Dkt. ##191 at 3 ¶ 14, 191-5 at 2 ¶ 7, 191-6 at 3, 192-1 at 39, 192-2 at 1.) Nurse Jernigan also notes that video cameras recorded Mr. Flores being more active than he let on, including walking without aid and moving normally. (Dkt. ##182 at 5–6 ¶ 15, 182-1 at 13.)

Plaintiffs deny that Mr. Flores was "faking" his symptoms at any time and point out that the video footage referenced by Nurse Jernigan has been "obliterated." (Dkt. #191 at 3 ¶ 15.) Plaintiffs note that Defendant Rife testified that Mr. Flores was transferred to the infirmary for "closer observation." (*Id.* at 9, ¶ 1, Dkt. #191-3 at 6.) Defendant Rife also testified that she understood that he was transferred because interventions like forced feeding and IV hydration, which would be appropriate if Mr. Flores's "vital signs became unstable," were not available at FCF. (Dkt. ##191 at 9, ¶ 2, 191-3 at 8.) Also of note is that, under the Colorado Department of Corrections' ("CDOC") hunger strike protocols, medical staff are required to monitor if the subject of the protocol is consuming at least 800 calories per day, and an inmate can be force fed and forcibly administered intravenous fluids—without medical staff obtaining a court order—if it becomes medically necessary for their health. (Dkt. ##191 at 9 ¶¶ 2–3, 191-2.)

On July 30, 2017, Nursing Supervisor Pamela Dang noted in Mr. Flores's medical record:

> Pt refuses to let me take his vital signs, and refuses an assessment. Pt did consent to answering some questions, and states he will provide a urine sample. Denies chest pain; Denies cough; Denies SOB, Appetite poor; states he is not hungry. Denies tenderness to abdomen. Denies N/V/D/ States his last BM was yesterday, and states it was 'regular'. Denies any problems with urination. Denies pain. Pt states he would like a liquid diet.

(Dkt. ##182 at 6 ¶ 16, 182-1 at 17.) Nurse Dang also notes that Mr. Flores "ambulates with a steady gait" and was "visualized drinking two cups of juice. (Dkt. ##182 at 6 ¶ 17, 182-1 at 19.) Plaintiffs counter that Mr. Flores attempted to communicate chest pain to Dave Bokel, a mental health provider, that same date by placing his left hand over the right side of his chest twice and grimacing. (Dkt. ##191 at 3–4 ¶ 16, 192-1 at 18.) Mr. Bokel writes that Mr. Flores "struggled to communicate with staff, only responding in brief answers, or shaking or nodding his head," and "appeared to indicate he could not communicate and was not eating because of his overall body discomfort." (Dkt. ##191 at 4 ¶ 17, 192-1 at 18.) Plaintiffs deny that Mr. Flores was walking or drinking normally, pointing in part to the declaration of Mr. Flores's infirmary cellmate, Luis Rojas, who, as is discussed in more detail below, rarely observed Mr. Flores moving, eating, or drinking. (Dkt. ##191 at 4 ¶ 17, 191-4 at 2–3, ¶¶ 12, 13, 15.)

On July 31, 2017, Mr. Flores was seen by Michael Walsh, a mental health provider, whose notes state that Mr. Flores "requested to be seen today by staff after several day [sic] of minimal verbal communication despite the patient being seen communicating with his infirmary cell mate and eating and drinking periodically"; "Malingering – Appears as his primary"; "No apparent need to make patient a mental health admit. He needs to work with security about what he is protesting with his hunger strike now." (Dkt. ##182 at 6 ¶ 18, 182-1 at 20–21.) Nurse Julie Gritz noted later the same day that Mr. Flores was not in acute distress and communicated by head nod that

he drank liquids fluids that day and was not having any medical issues. (Dkt. ##182 at 6–7 ¶ 19, 182-1 at 22.) Pointing again to his cellmate's declaration, Plaintiffs deny that Mr. Flores was malingering or even engaging in a "hunger strike"; rather, his refusal to eat or drink was caused by his deteriorating mental health. (Dkt. #191 at 4–5 ¶¶ 18–19.)

Nurse Virginia Truitt, who assumed care of Mr. Flores on July 31, 2017 at 6:00 p.m., noted in his medical record that Mr. Flores refused to answer any questions, but did allow vital signs to be taken. (Dkt. ##182 at 7 ¶ 20, 182-1 at 24.) Plaintiffs claim that Mr. Flores was *unable*—not unwilling—to communicate normally with medical staff at that time. (Dkt. #191 at 5 ¶ 20.)

Defendant Normandy assumed care of Mr. Flores on August 1, 2017 at approximately 6:00 a.m. During her rounds, Mr. Flores was lying in bed with his hands over his face and, according to Defendant Normandy's notes, he refused ("by nodding head no") to allow her to obtain his vital signs, lab draws, a nursing assessment, and medical provider evaluation. (Dkt. ##182 at 7 ¶ 21, 182-1 at 25.) Her notes also indicate that Mr. Flores had consumed some of his meals, that he denied having any problems with bowel and bladder, that his respirations were even and unlabored, and he did not appear to be in acute distress. (*Id.*) Plaintiffs do not deny that Mr. Flores was not observed leaving his bed and that Defendant Normandy did not obtain his vital signs, lab draws, a urine sample, or other medical assessments, but state that, given his condition, he did not have the mental capacity to refuse any course of treatment. (Dkt. #191 at 5–6 ¶ 21.) Plaintiffs also state that Defendant Normandy had no way of knowing whether Mr. Flores or his cellmate was eating and drinking the meals. (*Id.*)

Defendant Rife saw Mr. Flores for the first time on August 1, 2017 in the CTCF infirmary. Her notes indicate that Mr. Flores refused to allow a physical exam, but that his vital signs appeared stable and the nursing staff suspected that Mr. Flores was drinking water from the faucet and had reportedly eaten from his delivered food. (Dkt. ##182 at 8 ¶ 24, 182-1 at 27–28.) Defendant Rife ordered a calorie count on Mr. Flores. (*Id.*)

Nurse Truitt assumed care of Mr. Flores on August 1, 2017 at 6:00 p.m. According to her notes, Mr. Flores allowed her to take his vital signs (except his temperature), she observed that his lips were moist but he would not open his mouth for assessment, and Mr. Flores was

> Visiting with cell mate when staff not in cell. Cont to be non verbal with staff majority of the time. Per on call mental health pt started his behavior changes after he was denied a visit with his brother when it was discovered the brother was also a victim of the pts.

(Dkt. ##182 at 8 ¶ 25, 182-1 at 30.)

Defendants Rife and Normandy both saw Mr. Flores on August 2, 2017. Defendant Rife reviewed his vital signs and they were stable, and after she told Mr. Flores that she was concerned that he appeared to be dehydrated and that she did not want to progress to forcing fluids or food on him, Mr. Flores agreed to drink some ice water. (Dkt. ##182 at 8–9 ¶ 25, 182-1 at 31.) Defendant Rife also noted that she saw a small, quarter sized bloody mucus plug that Mr. Flores produced into the trash can, and reported, "I have to defer to my MH counter parts and agree that this pt is aware of the consequences of his actions. Since he actually drank water today, this is a hopeful sign." (Dkt. ##182 at 9 ¶ 25, 182-1 at 32.) Defendant Normandy recorded in her notes

that Mr. Flores "did drink approx. 1800 mls of water" and had allowed Defendant Rife to assess his physical condition. (Dkt. ##182 at 8–9 ¶ 27, 182-1 at 35.)

Plaintiffs remark that Defendants Rife and Normandy would have seen the notes from Nurse Catherine Marston, who had seen Mr. Flores overnight and noted that Mr. Flores had not eaten anything from his food tray, that his blood oxygenation level was 88% (which Defendant Normandy testified was "very low" and "concerning"), that "lung sounds clear but diminished bilaterally," that he "took very shallow breaths during the assessment," and that his pulse was 104. (Dkt. ##191 at 7–8, ¶¶ 26–27, 192-1 at 8–10, 191-8 at 17.) Plaintiffs also state that Mr. Flores's cellmate told every nurse that Mr. Flores was not eating, drinking, showering, or brushing his teeth, and that he was in obvious pain. (Dkt. ##191 at 7–8, ¶¶ 26–27, 192-4 at 3 ¶ 15.)

On the morning Mr. Flores died, August 3, 2017, at approximately 7:00 a.m., Defendant Normandy was walking by Mr. Flores's cell to go to the medication room and saw Mr. Flores sitting up on the edge of his bed. (Dkt. ##182 at 9 ¶¶ 28–29, 182-1 at 36, 182-2 at 1.) Her notes state that she went into his cell because his behavior was different from the previous day, and when she asked how he was doing, "he shook his head 'yes.'" (*Id.*) She then asked him if he needed anything, including ice water, "he shook his head 'no.'" (*Id.*) Mr. Flores did indicate that he had to urinate, and he took his cup and walked to the urinal, while Defendant Normandy left and went to the medication room. (*Id.*) Ten minutes later, security knocked on the door of the medication room and told Defendant Normandy that Mr. Flores was on the ground. (*Id.*) She went into the cell with Sgt. Valencia and Sgt. Pineda and Mr. Flores was in a supine position not responding and having seizure-like activity. (*Id.*)

Defendant Normandy left the cell to get another nurse and the "man down bag." (Dkt. ##182 at 10 ¶ 30, 182-1 at 36, 182-2 at 1.) Nurse Sheryl Rogers left the medication room when Defendant Normandy called for help and arrived in Mr. Flores's cell to find him lying on his back with Nurse Normandy assessing him. (Dkt. ##182 at 10 ¶ 30, 182-1 at 36, 182-2 at 1, 4.) Defendant Normandy and Nurse Rogers were unable to obtain Mr. Flores's blood pressure with the machine, but did obtain his oxygen level and heart rate, and they provided Mr. Flores with oxygen via a nasal canula. (Dkt. ##182 at 10 ¶ 31, 182-1 at 36, 182-2 at 1, 4.)

Records indicate that Mr. Flores began coming out of his seizure activity and was looking around when the medical staff was attempting to take his vital signs. (Dkt. ##182 at 10 ¶ 32, 182-1 at 36, 182-2 at 1, 4.) Sgt. Valencia and Sgt. Pineda assisted Mr. Flores to his feet, walked him to his bed, and told him to lie down, which Mr. Flores did. (Dkt. ##182 at 10 ¶ 33, 182-1 at 36, 182-2 at 1, 2, 5.) Nurse Benita Lotrich arrived at Mr. Flores' cell at approximately 7:11 a.m., saw that Mr. Flores was on oxygen and lying on his bed, and retrieved IV supplies at approximately 7:12 a.m. (Dkt. ##182 at 11 ¶ 34, 182-2 at 1, 3.) Defendant Normandy started an IV for Mr. Flores at 7:14 a.m. (*Id.*)

Defendant Normandy left the room, asked security to call emergency response, and called the clinic requesting medical provider assistance for the emergency. (Dkt. ##182 at 11 ¶ 35, 182-2 at 1.) Mr. Flores began to seize again at 7:15 a.m. (Dkt. ##182 at 11 ¶ 36, 182-2 at 3.)

Nurse Practitioners Nick Preston and Jane Gilden arrived at Mr. Flores' cell at approximately 7:16 a.m. and observed Mr. Flores lying on his bed appearing to be unconscious and unresponsive. They were told that medical staff had just lost Mr.

Flores's pulse. (Dkt. ##182 at 11 ¶ 36, 182-3 at 1 ¶¶ 2–3.) Nurse Practitioner Preston initiated CPR on Mr. Flores, and Sgt. Pineda and Nurse Practitioner Gilden rotated in doing chest compressions. (Dkt. ##182 at 11 ¶ 37, 182-3 ¶ 5.)

Defendant Normandy left the room again to grab an Air Mask Bag Unit ("Ambu bag") and returned "very quickly" to hold the Ambu bag in place over Mr. Flores's nose and mouth while Nurse Lotrich performed breaths. (Dkt. ##182 at 11 ¶ 37, 182-1 at 36, 182-2 at 1, 2, 182-3 at 2 ¶ 5.) An Automated External Defibrillator ("AED") was connected to Mr. Flores at 7:20 a.m. but it twice read "no shock advised" so CPR continued. (Dkt. ##182 at 11–12 ¶ 38, 182-1 at 36, 182-2 at 3, 4, 182-3 at 2 ¶ 5.)

Nurse Normandy switched out with Nurse Rogers and briefly left the room again to obtain equipment to connect Mr. Flores with oxygen through the Ambu bag. (Dkt. ##182 at 12 ¶ 39, 182-1 at 36, 182-2 at 1, 182-3 at 2 ¶ 7.) AMR arrived at 7:27 a.m. and assumed care of Mr. Flores, with medical staff aiding. CPR was conducted uninterrupted, excluding AED readings, from 7:16 a.m. until 7:41 a.m. (*Id.*) Mr. Flores was pronounced dead at 7:41 a.m. (Dkt. ##182 at 12 ¶ 40, 182-1 at 36, 182-2 at 1–5, 182-3 at 2 ¶ 7.)

**Eighth Amendment Deliberate Indifference Against Defendant Normandy**

Prisoners have a constitutional right to adequate medical care, and recovery under § 1983 is available for deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To establish such a claim, a plaintiff must first allege that the deprivation is "sufficiently serious" as an objective matter to constitute a deprivation of constitutional dimension—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." *Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020) (internal quotation marks omitted). Then, the plaintiff must allege the defendant was subjectively aware of that need and that failing to treat it would pose an excessive risk to the inmate's health or safety. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). The subjective component of deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This inquiry "presents a high evidentiary hurdle" to a deliberate indifference claim against a prison official, who "must know about and disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference. First, a medical professional may fail to treat a serious medical condition properly. Second, a prison official may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Medical personnel often face liability for failure to treat under the first type of deliberate indifference, but if "the medical professional knows that his role . . . is solely to serve as a gatekeeper for other medical personnel capable of treating the condition . . . he also may be liable for deliberate indifference from denying access to medical care." *Id.*

A delay in medical treatment constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm. *Id.* at 1210. The Tenth

Circuit has defined substantial harm to mean a "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 949–50 (10th Cir. 2001).

### Objective Component

The SHC Defendants do not dispute that, for the purpose of this motion, Mr. Flores's seizure and the pulmonary thromboembolism that caused his death were sufficiently serious to meet the objective prong.

Plaintiffs argue that Mr. Flores suffered from additional objectively serious medical needs. First, he experienced psychosis and mental illness. This is corroborated by CDOC records showing that Mr. Flores had "high MH [mental health] needs." (*See* Dkt. #191-1.)

Plaintiffs also contend that Mr. Flores suffered from leg and chest pain and prolonged immobility. The medical records indicate that leg pain was not a consistent complaint. On July 20, 2017, mental health workers referred him to the FCF clinic on an emergency walk-in because he was doubled over with leg pain, but he told the nurse that although he had some pain in the past two weeks, he had "zero" pain when he arrived. (Dkt. #182-1 at 3.) This appears to the be only reference to leg pain in the record. As to chest pain, on July 30, 2017, mental health provider Dave Bokel observed Mr. Flores "reach[ ] for the right side of his chest once or twice with his left hand and accompanied this gesture with a facial grimace, appearing to indicate chest pain." (Dkt. #192-1 at 18.) Mr. Flores's cellmate also observed him grabbing his chest and wincing whenever he moved. (Dkt. #191-4 at 3 ¶ 14.) Other medical records indicate that Mr. Flores denied having chest pain. (*See* Dkt. #182-1 at 17.) This is a factual question that should be resolved by the trier of fact. As is the issue of Mr. Flores's mobility or lack

thereof. Some records state that Mr. Flores was able to ambulate normally. (*See* Dkt. #182-1 at 1, 12, 18.) But his cellmate states Mr. Flores "would lay in bed all day and night." (Dkt. #191-4 at 3 ¶ 13.) The SHC Defendants concede that Mr. Flores would "lay in bed for hours at a time," although they appear to attribute this to laziness rather than a medical condition. Whether his lack of mobility was a choice, or a symptom of a larger problem is question best left to a jury.

Finally, Plaintiffs argue that Mr. Flores suffered from severe dehydration and malnourishment. Again, there are genuine questions of material fact as to whether Mr. Flores was suffering from dehydration. The SHC Defendants point out that on July 29, 2017, Mr. Flores had unremarkable labs done with no indication for dehydration. (Dkt. #182 at 22.) However, Mr. Flores's cellmate states that he encouraged Mr. Flores to eat he drink but he could not, and that he relayed this to nurses "over and over." (Dkt. #191-4 at 2 ¶¶ 11–12.) Moreover, Nurse Rife noted on August 2, 2017 that Mr. Flores "appeared to be dehydrated," and Defendant Normandy assessed him and found his "[m]ucous membranes dry." (Dkt. #182-1 at 31, 35.) And the day before, Nurse Truitt noted, "Unsure if pt is taking food/fluid as he is not in a single cell nor is there a camera in the cell to verify what is happening when pt is not observed. (*Id.* at 30.) In short, whether Mr. Flores was suffering from severe dehydration and malnutrition cannot be determined on a Rule 56 motion.

## Subjective Component

The Court now turns to Defendant Normandy's subjective awareness of Mr. Flores's serious medical needs.

Plaintiffs claim that Defendant Normandy was deliberately indifferent to Mr. Flores's severe dehydration and immobility (and related potentially profoundly serious effects) by failing to take even the simple steps of making sure that he consumed adequate fluids and by giving him compression socks for his legs to improve blood flow. They also argue that Defendant Normandy should have increased her monitoring of Mr. Flores's condition, especially as it deteriorated, and provided appropriate referrals to other medical professionals. Finally, they contend that Defendant Normandy acted with deliberate indifference by failing to provide emergency medical treatment on the day he died.

Addressing the last argument first, the Court finds that there is no evidence that Defendant Normandy acted with deliberate indifference after Mr. Flores suffered a seizure on August 3, 2017. Although she did leave the cell several times, each time was either to seek additional help or to get emergency equipment. And there is no doubt that Defendant Normandy participated in the efforts to treat Mr. Flores thereafter, including putting an IV in his arm and assisting with CPR. This cannot form the basis for deliberate indifference liability under the Eighth Amendment.

Defendant Normandy saw Mr. Flores on two other occasions. She assumed care of Mr. Flores on the morning of August 1, 2017. Mr. Flores was verbally uncommunicative and refused the taking of vital signs, lab draws, or other assessment, but he did not exhibit signs of chest or leg pain. (Dkt. #182-1 at 25.) A portion of his breakfast and lunch had been consumed, although Defendant Normandy did not see Mr. Flores eat the meals. (*Id.*, Dkt. #191-8 at 15, 16.) When she saw Mr. Flores the next day, she reported that he consumed almost two liters of water. (Dkt. #182-1 at 35.)

Looking at her notes in a vacuum, then, they do not show that Defendant Normandy was subjectively aware that Mr. Flores was experiencing a mental health crisis, was dangerously dehydrated, or was at risk of experiencing seizures or a pulmonary embolism. However, Plaintiffs submitted the Declaration of Luis Rocha Rojas, Mr. Flores's cellmate at the CTCF infirmary (Dkt. #191-2), in which he states:

- "I was told that Mr. Flores was under observation because of a "hunger strike." As far as I saw, Mr. Flores was not on any sort of 'hunger strike.' I don't have any medical training, but it was obvious even to me that Mr. Flores was suffering from a serious mental health issue." (*Id.* at 1–2 ¶ 5.)

- "Mr. Flores did not shower or take care of his personal hygiene in any way. He never brushed his teeth on his own. His breath smelled so bad that the guards would keep the door of the cell cracked for fresh air. . . . I did not understand why the nurses didn't do anything to help." (*Id.* at 2 ¶ 7.)

- "During the time that we were cellmates, I only remember seeing him drink anything once or twice. I only saw him urinate a handful of times – definitely not every day." (*Id.* at 2 ¶ 9.)

- I never saw him eat food. I knew that he was really sick, and tried to convince him to eat something. . . . He just shook his head. I was really worried about him." (*Id.* at 2 ¶ 10.)

- "The guards knew that Mr. Flores wasn't eating and told me to try to get him to. It was clear to anyone who saw Mr. Flores that he was in bad shape, but no matter how much I tried to encourage him to eat and drink, he couldn't." (*Id.* at 2 ¶ 11.)

- "I told nurses over and over that Mr. Flores wasn't eating or drinking, but they didn't do anything about it. (*Id.* at 2 ¶ 12.)

- "Mr. Flores would lay in bed all day and night. When he was awake, he would stare at the ceiling without saying anything. He hardly ever moved from his bed." (*Id.* at 3 ¶ 13.)

- "I also noticed that the few times he [sic] when he did get up or sit up, Mr. Flores would grab his chest. Every time he moved, he grabbed his chest and winced like it was hurting. I could see he was in real pain." (*Id.* at 3 ¶ 14.)

- "Nurses and guards would visit our cell every day. Every time a nurse came to the cell, I would tell her that Mr. Flores wasn't eating, drinking, showering, or brushing his teeth. I told her I could see that he was in obvious pain. Each time, the nurse would totally ignore me. The nurses refused to care for Mr. Flores. Often, the nurse would not even talk to Mr. Flores when she came to the cell." (*Id.* at 3 ¶ 15.)

- "I only saw a nurse take Mr. Flores' vital signs a couple times during the time we were celled together. I never saw a nurse give Mr. Flores any medications." (*Id.* at 3 ¶ 16.)

Although Mr. Rojas does not identify any of the nurses by name, it is clear that one of them was Defendant Normandy, as he describes what happened after Mr. Flores collapsed on August 3, 2017: "Then, I saw the nurse through a window and screamed at the nurse that he was dying. It was the first time I ever saw her act like she cared at all. She dropped what she was doing and went to cell. I heard her screaming his name. . . ." (*Id.* at 4 ¶ 21.)

This declaration establishes that there exists genuine disputes as to (1) whether it was obvious that Mr. Flores was undergoing a mental health emergency rather than a "hunger strike"; (2) whether it was obvious that Mr. Flores was in physical pain, including experiencing chest pain and wincing whenever he moved (also observed by Mr. Bokel); (3) whether medical staff were explicitly told by Mr. Rojas that Mr. Flores was in pain and needed treatment; (4) if and how often Mr. Flores moved from his bed; (5) if and how often Mr. Flores ate, drank, urinated, or bathed; and (6) whether Defendant Normandy ignored the conditions, symptoms, and warning signs described above. Accordingly, summary judgment should be denied as to Plaintiffs' Eighth Amendment deliberate indifference claim against Defendant Normandy.

**Medical Negligence Against Defendants Normandy and Rife**

To establish a medical negligence claim against Defendants Normandy and Rife, Plaintiffs must plausibly allege the following elements: (1) Defendants owed Mr. Flores a legal duty of care; (2) Defendants breached that duty; (3) Mr. Flores was injured; and (4) Defendants' breach proximately caused injury. *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo. 1993). "[A] general claim for negligence in medical treatment arises when a physician's care falls below the degree of knowledge, skill, and care used by other physicians practicing the same specialty." *Gorab v. Zook*, 943 P.2d 423, 427 (Colo. 1997) (citation omitted).

The SHC Defendants argue that Plaintiffs cannot establish the second or third element of the claim. Plaintiffs counter that Defendants Rife and Normandy not only breached the duty of care owed to Mr. Flores, but did so willfully and wantonly, and

claim that their defective medical care was the proximate cause of Mr. Flores's death. Both parties cite expert reports to support their respective positions.

The SHC Defendants attach the report of Dr. John Moore, identified as "a Board-Certified general surgeon, with experience providing diagnostic and surgical care regarding pulmonary thromboembolism, and with experience in responding to Codes in the institutional setting." (Dkt. #182 at 22.) Dr. Moore opined that "[t]here was no indication Mr. Flores was experiencing a pulmonary embolus until he collapsed on the morning of August 3, 2017," "[t]he allegation Mr. Flores was dehydrated is not substantiated on the objective data," and "the symptoms associated with a pulmonary embolism tend to be non-specific and would be extremely difficult to correlate with a PE in a low-risk situation." (Dkt. #182-7 at 2–3.) Dr. Moore concluded his report: "In summary, the care provided in my opinion was reasonable and appropriate. Neither Ms. Normandy or Ms. Rife could be considered to have violated the standards of care or committed deliberate indifference when compared to the expected behavior of other practitioners with similar training and in similar circumstances." (Dkt. #182-7 at 3.)

The SHC Defendants also cite the report prepared by Dr. Susan M. Tiona, a former chief medical officer for the CDOC, on the question of causation.[4] Like Dr. Moore, Dr. Tiona believes that it was unlikely that Mr. Flores was dehydrated at the time of his death, and opines that dehydration is not a significant risk factor in developing blood clots in the leg anyway. (Dkt. #182-6 at 14 ¶ 59.) Dr. Tiona further opines that Mr. Flores did not exhibit any signs of blood clots in his legs and a

---

[4] Dr. Tiona's report was prepared for Nurse Marston, who has since been dismissed.

"catastrophic event . . . wherein the pulmonary arterial system is essentially occluded and death occurs within minutes," is a "type of medical event [that] cannot be predicted, and once it happens, there is very little benefit that medical interventions can offer." (*Id.* ¶¶ 60–61.)

Plaintiffs offer their own expert reports. Lori E. Roscoe is an Advanced Practice Registered Nurse who reviewed the record and believes that "[i]t is clear that the healthcare staff ignored the very obvious signs of Mr. Flores' serious medical condition." (Dkt. #191-7 at 12.) She states that Defendant Rife's failure to obtain a complete set of vital signs, especially when records show abnormal findings like an oxygen saturation of only 88%, "deviated from the applicable standard of care and showed deliberate indifference to Mr. Flores' obvious and serious physical need." (*Id.* at 12–13.) She also says that Defendant Rife ignored signs association with pulmonary infarct on August 1 and August 2, 2017, when Mr. Flores's records documented shallow breathing and Defendant Rife had observed Mr. Flores had hemoptysis (coughing up blood). (*Id.* at 17.) Ms. Roscoe also points out "several areas of testimony by NP Rife that are inconsistent," and describes "an overall pervasive attitude . . . that Mr. Flores was malingering/faking in condition rather than he was slipping further and further into schizophrenia, as had occurred in the past." (*Id.* at 17–18.)

Ms. Rosco also criticizes Defendant Normandy's response to Mr. Flores's medical emergency on August 3, 2017, including her decision to leave the cell multiple times to do tasks officers could have done and not even returning with the appropriate equipment. (*Id.* at 15–16.) She further criticizes all of the nurses for their failure to

review Mr. Flores's medical records, especially because he was unable to discuss his health history with them. (*Id.* at 16.)

Plaintiffs also attach the expert opinion of Dr. Michael J. Jobin, an Emergency Physician with over 40 years of experience. Dr. Jobin's summary includes the following opinions:

> It is my opinion that if the Defendants had appropriately addressed the severe psychiatric decompensation Mr. Flores plainly was experiencing, and had instituted medications to treat his schizophrenia [ ], he likely would have started to eat and drink, resumed physical activity, and lived. Moreover, had those medical personnel appropriately addressed the signs and symptoms of venous thromboemboli in his legs and had appropriately addressed the signs and symptoms of pulmonary thromboemboli, Mr. Flores likely could have been successfully treated with anticoagulants to stop the blood clotting processes that caused his death. Difficulty breathing, decreased lung sounds on physical examination, coughing up blood, and swelling and pain in the legs of a person who is remaining in bed and not moving are obvious signs of a critical problem that any nurse or allied medical personnel can recognize and bring to the attention of a physician, and that nurse or allied medical personnel can advocate for the welfare of that patient. This was clearly not done for Mr. Flores and demonstrated deliberate and willful disregard for the health and welfare of Mr. Flores. Mr. Flores was left to suffer and die in his bed while the medical and behavioral health personnel watched and documented his decline while he was in pain.
>
> . . .
>
> To be clear, even had the Defendants failed to immediately treat Mr. Flores' psychological mental condition, they still likely could have saved his life by instituting the detention center's policy for treatment of a "hunger strike" and treating the dehydration, malnourishment, and inactivity. By ensuring that he was properly fed and hydrated, and that he moved around periodically and/or otherwise maintained adequate circulation in his legs, the medical staff most likely would have prevented his death. These principles of encouraging physical activity and movement to prevent blood clots in patients who are hospitalized is well recognized as a very important part of nursing care of patients. The use of compression stockings in hospitalized post operative patients is also a well-recognized treatment for nurses caring for bedridden patients to prevent blood clots in the legs and could have been used effectively for Mr. Flores. Nothing was done for Mr. Flores to stop the progression of dehydration, malnutrition, inactivity, and the pain of blood clots in his legs and the lungs resulting in the death of part of his lungs called a pulmonary infarction.

(Dkt. #191-13 at 6–7.) Thus, Dr. Jobin opined on both the breach of the duty of care ("Mr. Flores was left to suffer and die in his bed while the medical and behavioral health personnel watched and documented his decline while he was in pain.") and causation ("By ensuring that he was properly fed and hydrated, and that he moved around periodically and/or otherwise maintained adequate circulation in his legs, the medical staff most likely would have prevented his death.").

The SHC Defendants implicitly ask the Court to find Dr. Tiona and Dr. Moore's opinions more persuasive. But, on summary judgment, the "approach of weighing the credibility of the competing expert reports amounts to improper fact-finding. Indeed, competing expert opinions present the classic battle of the experts and it is up to [the trier of fact] to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citations and internal quotations omitted); *see also Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-3012-WJM-NYW, 2015 WL 5081608, at *6 (D. Colo. Aug. 28, 2015) ("Accordingly, the competing expert reports establish a disputed question of material fact as to the relevant market share at issue here, and summary judgment must be denied on that issue."). The parties' competing expert reports, and the factual disputes they necessarily represent, preclude granting summary judgment. *See Hickey v. Merritt-Scully*, No. 4:18-CV-01793, 2022 WL 883851, at *11 (M.D. Pa. Mar. 24, 2022) ("Eighth Amendment deliberate indifference claims, like professional malpractice claims, entail fact-specific inquiries, which involve credibility determinations, weighing of evidence and the drawing of inferences from the facts. And, when presented with several competing expert reports, as we have here, on summary judgment the court may not invade the functions

of the jury in these matters.").

**Vicarious Liability Against SHC**

Because Defendants Normandy and Rife are not entitled to summary judgment on Plaintiffs' medical negligence claim, the SHC Defendants are likewise not entitled to summary judgment on Plaintiffs' vicarious liability claim against their employer, SHC.

## MOTION TO AMEND

Plaintiffs seek to amend their Complaint to allow an award of punitive damages on their state law medical negligence claim pursuant to Colo. R. Civ. P. § 13-21-102(1.5)(a). That statute provides that exemplary damages "may be allowed by amendment to the pleadings only after the exchange of initial disclosures pursuant to rule 26 of the Colorado rules of civil procedure and the plaintiff establishes prima facie proof of a triable issue." The existence of a triable issue on liability for exemplary damages is established by showing a reasonable likelihood that the issue will ultimately be presented to the jury for resolution. *Leidholt v. District Court*, 619 P.2d 768, 771 N .3 (Colo. 1980).

Under § 13-21-102(1)(a), exemplary damages may be awarded if a defendant's action resulted in an injury "attended by circumstances of fraud, malice, or willful and wanton conduct." Willful and wonton conduct is "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of others, particularly the plaintiff." Colo. Rev. Stat. § 13-21-102(1)(b). "Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the

statutory requirements are met." *Affordify, Inc. v. Medac*, Inc., Civil Action No. 19-cv-02082-CMA-NRN, 2020 WL 6290375, at *4 (D. Colo. Oct. 27, 2020) (citation omitted).

A party seeking to add a claim for exemplary damages need not respond to contrary evidence. *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, Civ. No. 16-cv-1301-PAB-GPG, 2018 WL 3055772, at *4 (D. Colo. May 10, 2018) ("At this stage of the litigation, the Court is only concerned with whether the evidence, when viewed in the light most favorable to Plaintiffs, is sufficient to make out a prima facie case of willful and wanton behavior for the purpose of allowing Plaintiffs to amend their Complaint to include exemplary damages, not whether such evidence is sufficient to defeat a motion for summary judgment or to result in a jury verdict in Plaintiffs' favor."); *Am. Econ. Ins. Co. v. William Schoolcraft, M.D., P.C.*, No. 05-cv-01870-LTB-BNB, 2007 WL 160951, at *4 (D. Colo. Jan. 17, 2007), ("I am concerned here only with the preliminary question of whether [the plaintiffs] have made a prima facie case under § 13-21-102(1.5)(a), not with summary judgment."). Thus, an opposing party's effort at explaining or rebutting prima facie proof or provision of contrary evidence serves no purpose. In deciding whether a moving party has established a prima facie case, the Court looks only to the evidence provided by the moving party and views that evidence in the light most favorable to Plaintiffs.

The parties' briefing on the Motion to Amend overlaps in large part with the summary judgment filings. Of special interest here are the expert reports of Ms. Roscoe and Dr. Jobin. Both offer opinions that Defendants Rife and Normandy acted with reckless and willful and wanton indifference to Mr. Flores's serious medical needs. Specifically, Ms. Roscoe states

> The failure of NP Rife, RN Normandy and all nursing staff at the Colorado Territorial Correctional Center to become aware of Mr. Flores' health history through health record review and to consider his past medical history, including reported leg pain and an unknown blood disorder, especially since he was unable to share that information with them himself, was reckless and demonstrated a conscious disregard of a life-threatening risk.

(Dkt. #185-7 at 16–17.)

Further, as noted above, Dr. Jobin states the failure to recognize and act upon the "obvious signs of a critical problem" ("[d]ifficulty breathing, decreased lung sounds on physical examination, coughing up blood, and swelling and pain in the legs of a person who is remaining in bed and not moving") demonstrates "deliberate and willful disregard for the health and welfare of Mr. Flores." (Dkt. #185-12 at 6–7.)

Given the low threshold for amending to add a claim for exemplary damages under Colorado law, Plaintiffs' claim for exemplary damages will be allowed.

## **CONCLUSION**

In light of the foregoing, it is hereby

**RECOMMENDED**[5] that the SHC Defendants' Motion for Summary Judgment (Dkt. #182) be **DENIED.** It is further

---

5 Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148–53 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir. 1996).

**ORDERED** that Plaintiffs' Motion to Amend Complaint to Assert Exemplary Damages Remedy Under State Law Against Defendants Normandy and Rife (Dkt. #185) is **GRANTED**.

Date: August 8, 2023

_____
N. Reid Neureiter
United States Magistrate Judge